**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

UNITED STATES OF AMERICA

and

STATE OF WISCONSIN,

      Plaintiffs,

  v.

CONSUMER LAW PROTECTION, LLC, a
Missouri limited liability company;

CONSUMER RIGHTS COUNCIL, a Missouri
nonprofit corporation;

PREMIER RESERVATIONS GROUP, LLC, a
Missouri limited liability company;

RESORT TRANSFER GROUP, LLC, a Missouri
limited liability company, also doing business as
CONSUMER LAW PROTECTION LAWYERS;

SQUARE ONE DEVELOPMENT GROUP, INC., a
Missouri corporation, also doing business as
SQUARE ONE GROUP;

SQUARE ONE GROUP, LLC, a Missouri limited
liability company;

TIMESHARE HELP SOURCE, a Colorado limited
liability company;

FARMINGTON ALLEGIANCE, LLC, a Missouri
limited liability company;

MAINLINE PARTNERS, LLC, a Missouri limited
liability company;

THE JAKE AND AVERY IRREVOCABLE TRUST
DATED SEPTEMBER 11, 2019;

**Case No. _____**


**JURY TRIAL DEMANDED**

THE MAGGIE AND LUCY IRREVOCABLE
TRUST DATED SEPTEMBER 11, 2019;

CHRISTOPHER CARROLL, individually, and as an
owner, officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

GEORGE REED, individually, and as an owner,
officer, director, member, and or/manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

LOUANN REED, individually, and as an owner,
officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

SCOTT JACKSON, individually, and as an owner,
officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source; and

EDUARDO BALDERAS, individually, and as an
owner, officer, director, member, and/or manager of
Consumer Law Protection, LLC, Consumer Rights
Council, Premier Reservations Group, LLC, Resort
Transfer Group, LLC, Square One Development
Group, Inc., Square One Group, LLC, and Timeshare
Help Source;

      Defendants.

_____

**COMPLAINT FOR PERMANENT INJUNCTION,**
**MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF**

Plaintiffs, the United States of America, acting upon notification and authorization to the

Attorney General by the Federal Trade Commission ("FTC"), pursuant to Section 16(a)(1) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), and the State of Wisconsin,

for their Complaint allege:

### NATURE OF THE CASE

1.        The 16 Defendants here consist of four consumer-facing companies that pitch

timeshare exit services, three sham entities designed to lend legitimacy to the consumer-facing

defendants, two parent companies that control these seven subsidiary companies, two trusts that

owned or still own the parent companies, and five individuals who collectively owned or ran the

corporate Defendants at relevant times. Together, they have operated a fraudulent timeshare exit

scheme that primarily targets older adults across the country. Defendants use direct mail

campaigns to lure consumers to high-pressure sales presentations at local hotels and restaurants.

During these sales presentations, Defendants falsely represent that they are working for, or

affiliated with, reputable timeshare exchanges and developers, and that they are one of the few

"authorized" or accredited timeshare exit companies. Defendants also use misleading or false

tactics to convince consumers that they must act immediately or be stuck with their timeshares

forever, potentially saddling their children and grandchildren with timeshare maintenance fees.

2.        Having stoked consumers' fears and created a sense of urgency, Defendants then

charge consumers an exorbitant upfront fee to get out of their timeshares. Defendants typically

represent that they will accomplish this within a specified time or fully refund the upfront fee. In

fact, Defendants typically do not succeed in helping consumers to get out of their timeshare

within the specified time, if at all. And Defendants seldom make good on their promise to refund

consumers' fees.

3.      Through these practices, Defendants deceived consumers throughout the U.S. into

paying more than $90 million for Defendants' timeshare exit services that were not delivered.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

1345, and 1355(a); and 15 U.S.C. §§ 45(a) and 56(a)(1).

5.      At all times relevant to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(1), (c)(2),

and (d), 18 U.S.C. § 1395(a), and 15 U.S.C. § 53(b).

7.      This Court has supplemental jurisdiction over the State of Wisconsin's claims

pursuant to 28 U.S.C. § 1367(a).

## FEDERAL PLAINTIFF

8.      This action is brought by the United States of America on behalf of the FTC

under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or

practices in or affecting commerce, and the FTC's Cooling-Off Rule, 16 C.F.R. Part 429, which

requires sellers of certain goods or services at places other than the seller's place of business to

notify buyers of their right to cancel the transaction within three business days and prohibits

sellers from misrepresenting buyers' right to cancel.

## STATE PLAINTIFF

9.      The Wisconsin Attorney General and Wisconsin Department of Justice bring this

action in the name of Plaintiff **State of Wisconsin** to enforce and enjoin violations of the

Wisconsin Direct Marketing Rule, Wis. Admin. Code § ATCP chapter 127, and the Wisconsin

Fraudulent Misrepresentation Law, Wis. Stat. § 100.18, and to seek temporary and permanent

injunctive relief, civil forfeitures, restitution for consumer pecuniary losses, and other relief, such

as recovery of the State of Wisconsin's costs. Wis. Stat. §§ 100.18(11)(d), 100.20(6), 100.26(4),

100.26(6), and 100.263.

## DEFENDANTS

### Corporate Defendants

10.    Defendant **Consumer Law Protection, LLC**, ("CLP") is a Missouri limited

liability company with its principal place of business at 8600 Daniel Dunkin Drive, Pevely,

Missouri 63070. CLP transacts or has transacted business in this District and throughout the

United States. At all times relevant to this Complaint, acting alone or in concert with others, CLP

has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the

United States.

11.    Defendant **Consumer Rights Council**, ("CRC") is registered as a Missouri

nonprofit corporation with its principal place of business at 8600 Daniel Dunkin Drive, Pevely,

Missouri 63070. Although registered as a Missouri nonprofit, CRC was registered by a

representative of the other Defendants and operates to further their timeshare exit scheme. As a

result, CRC is organized to carry on business for its own profit, for that of its members, or for the

Corporate Defendants within the meaning of Section 4 of the FTC Act. CRC transacts or has

transacted business in this District and throughout the United States. At all times relevant to this

Complaint, acting alone or in concert with others, CRC has advertised, marketed, distributed, or

sold timeshare exit services to consumers throughout the United States.

12.    Defendant **Premier Reservations Group, LLC**, ("PRG") is a Missouri limited

liability company with its principal place of business at 8600 Daniel Dunkin Drive, Pevely, Missouri 63070. PRG transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, PRG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

13.     Defendant **Resort Transfer Group, LLC**, also doing business as Consumer Law Protection Lawyers ("RTG"), is a Missouri limited liability company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. RTG transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, RTG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

14.     Defendant **Square One Development Group, Inc.**, also doing business as Square One Group ("SODG"), is a Missouri corporation with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. SODG transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, SODG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

15.     Defendant **Square One Group, LLC** ("SOG"), is a Missouri limited liability company with its principal place of business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. SOG transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, SOG has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

16.     Defendant **Timeshare Help Source** ("THS") is a Colorado limited liability company with its principal place of business at 525 N. Cascade Avenue, Colorado Springs, Colorado 80903. THS transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, THS has advertised, marketed, distributed, or sold timeshare exit services to consumers throughout the United States.

17.     Defendant **Farmington Allegiance, LLC** ("Farmington") is a closely-held, Missouri limited liability company that does business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. Formed in September 2019, Farmington is the parent entity/ holding company that, on information and belief, wholly acquired CLP, CRC, PRG, RTC, SODG, SOG, and THS ("Subsidiaries") in a non-arms length transaction for less than fair market value and now wholly owns the Subsidiaries. Farmington transacts or has transacted business in this District and – through the Subsidiaries – throughout the United States. From September 17, 2019 forward, Farmington has controlled SOG, PRG, RTG, and THS through operating agreements that make Farmington the sole member of these entities. At relevant times, Carroll and George Reed were the managers of both Farmington and the Subsidiaries.

18.     Defendant **Mainline Partners, LLC** ("Mainline") is a closely-held, Missouri limited liability company that does business at 1610 Des Peres Road, Suite 150, St. Louis, Missouri 63131. Formed in September 2019, Mainline is the parent entity/ holding company that, on information and belief, wholly acquired Farmington in a non-arms length transaction for less than fair market value. Mainline transacts or has transacted business in this District and – through Farmington and the Subsidiaries – throughout the United States.

19.     Defendants Farmington and Mainline each constitute an alter ego of the

Subsidiaries, and Mainline also constitutes an alter ego of Farmington. Farmington and Mainline, through Carroll and George Reed, used the Subsidiaries as their instrumentality or business conduit, used at least one Mainline bank account as a conduit for payments to and from the Subsidiaries as well as to other non-defendant companies controlled by Farmington and Mainline, and controlled the Subsidiaries' assets for the benefit of Farmington and Mainline. Farmington and Mainline failed to maintain an arms-length relationship between themselves and their Subsidiaries, and there is no separation between Farmington and Mainline. The Subsidiaries shared employees, who performed work for multiple Subsidiaries and worked for other companies controlled by Carroll and Reed. If Farmington and Mainline were not found to be responsible as alter egos, it would promote injustice, inequity and fraud on consumers by Carroll and George Reed.

20.     On information and belief, Defendant **The Jake and Avery Irrevocable Trust dated September 11, 2019** (the "Carroll Trust") was a family trust and the partial or full owner of Mainline at all relevant times. On June 5, 2022, the Carroll Trust acquired full ownership of Mainline from the Maggie and Lucy Irrevocable Trust (the "Reed Trust") (together, the "Trusts"). The Trustee of the Carroll Trust is Kim Carroll, wife of Defendant Christopher Carroll.

21.     The Carroll Trust constitutes an alter ego of Defendants Christopher Carroll ("Carroll"), Mainline, Farmington, and the Subsidiaries. Carroll, the Carroll Trust, Mainline, Farmington, and the Subsidiaries have a unity of interest and have disregarded any separate entity. On information and belief, the transfer of Mainline stock to the Carroll Trust was not an arms-length transaction and was for less than fair market value. On information and belief, up until June 5, 2022, Carroll, George Reed, and the Trusts together controlled Mainline,

Farmington, and the Subsidiaries through Carroll's and Reed's leadership roles at these companies, and through their control over these companies' bank accounts through the trusts. Following the transfer of Mainline stock to the Trusts, Mainline, Farmington, and the Subsidiaries continued to have substantially identical management, agents, business, purpose, operation, customers, and supervision as before. After the Carroll Trust acquired Mainline from the Reed Trust, Carroll and the Carroll Trust obtained total control over Mainline, Farmington, and the Subsidiaries and continued to exercise control over them.

22.     On information and belief, Defendant **The Maggie and Lucy Irrevocable Trust dated September 11, 2019** (the "Reed Trust") was a family trust and a co-owner of Mainline, along with the Carroll Trust, at all relevant times up until June 5, 2022. The Trustee of the Reed Trust is Defendant LouAnn Reed.

23.     The Reed Trust constitutes an alter ego of Defendants George Reed, LouAnn Reed (together, "the Reeds"), Mainline, Farmington, and the Subsidiaries. The Reeds, the Reed Trust, Mainline, Farmington, and the Subsidiaries have a unity of interest and have disregarded any separate entity. On information and belief, up until June 5, 2022, Carroll, George Reed, and the Trusts together controlled Mainline, Farmington, and the Subsidiaries through Carroll's and the Reeds' leadership roles at these companies and through their control over these companies' bank accounts. Following the transfer of Mainline stock to the Reed Trust, Mainline, Farmington, and the Subsidiaries continued to have substantially identical management, agents, business, purpose, operation, customers, and supervision as before, up until the Reed Trust sold its stake in Mainline to the Carroll Trust on June 5, 2022 in another non-arms length transaction for less than fair market value.

24.     The Trusts used Mainline, Farmington, and the Subsidiary Defendants as their

instrumentality or business conduit and controlled their assets for the benefit of the Trusts. If the Trusts were not found to be responsible as alter egos, it would promote injustice, inequity and fraud on consumers by Carroll and the Reeds.

**Individual Defendants**

25.     Defendant **Christopher Carroll** is or has been an owner, officer, director, member, and/or manager of Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Carroll is listed on corporate documents as President and CEO of Square One Group. He is a signatory on Corporate Defendants' bank accounts. Carroll has participated in timeshare exit sales presentations and has communicated with consumers about their timeshares. Carroll regularly is present at Corporate Defendants' business premises, hires employees, oversaw the sales teams, and directs day-to-day business operations. On information and belief, he has used the assets of at least one Subsidiary to pay for non-business expenses. Carroll resides in this District and, in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

26.     Defendant **George Reed** is or has been an owner, officer, director, member, and/or manager of Premier Reservations Group, Square One Development Group, Square One Group, LLC, and Resort Transfer Group, LLC. At all times material to this Complaint, acting alone or in concert with others, Defendant George Reed has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. He is a signatory on Corporate Defendants' bank accounts. At least up until the June 5, 2022 sale of Mainline, he was regularly present at Corporate Defendants' business premises, hired employees,

and directed day-to-day business operations. George Reed resides in this District, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

27.     Defendant **LouAnn Reed** is or has been an owner, officer, director, member, and/or manager of Corporate Defendants. She is the wife of Defendant George Reed. At all times material to this Complaint, acting alone or in concert with others, LouAnn Reed has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. At least up until the June 5, 2022 sale of Mainline, LouAnn Reed maintained the title of President, Secretary, and Director of SODG and was a signatory on Corporate Defendants' bank accounts. LouAnn Reed resides in this District, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

28.     Defendant **Scott Jackson** is or has been an owner, officer, director, member, and/or manager of the Subsidiaries. At all times relevant to this Complaint, acting alone or in concert with others, Jackson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Jackson maintains the title of Director and Vice President of Square One Group, LLC and CLP. Jackson manages sales teams and is regularly present at timeshare exit sales presentations with consumers. Jackson regularly is present at Corporate Defendants' business premises and directs day-to-day business operations. He routinely responds to consumer complaints. Jackson resides in this District, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

29.     Defendant **Eduardo Balderas** is or has been an owner, officer, director, member

and/or manager of Corporate Defendants. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Balderas maintains the title of Director and Vice President of Square One Group, LLC and National Director of CLP. He manages sales teams and frequently is present at timeshare exit sales presentations. Balderas routinely delivers initial group presentations at the start of sales meetings with consumers. He also assists directly in selling timeshare exit services to consumers. Balderas regularly responds to consumer complaints. He resides in this District, and in connection with the matters alleged herein, transacts, or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

30.     Corporate Defendants have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below. Corporate Defendants have conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that have commingled funds. Because Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## THE FTC ACT AND THE COOLING-OFF RULE

31.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a).

32.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid

themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

33.    The Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations (the "Cooling-Off Rule"), 16 C.F.R. Part 429, gives buyers of certain goods and services three days to cancel purchases of $25 or more when the sale takes place at the buyer's home, or $130 or more when the sale takes place at any location other than the Seller's place of business (*e.g.*, at facilities rented on a temporary or short-term basis, such as hotel or motel rooms, convention centers, or fairgrounds and restaurants). 16 C.F.R. § 429.0(a), 429.1. Specifically, the Cooling-Off Rule:

- requires the seller to furnish the buyer with a fully completed receipt or copy of any contract pertaining to such sale at the time of its execution, which must contain a statement summarizing the buyer's right to cancel within three business days. 16 C.F.R. § 429.1(a);

- requires the seller to inform buyers about cancellation rights at the time of the sale by giving the buyer two copies of a cancellation form that includes the required caption and notice language. 16 C.F.R. § 429.1(b) and (c);

- prohibits sellers from including in any contract or receipt a waiver of the rights to which the buyer is entitled under the Cooling-Off Rule, including specifically the buyer's right to cancel the sale in accordance with the Cooling-Off Rule. 16 C.F.R. § 429.1(d);

- requires that, at the time the buyer signs the contract or purchases the goods or services, the seller must orally inform the buyer of the buyer's right to cancel. 16 C.F.R. § 429.1(e); and

- prohibits the seller from misrepresenting in any manner the buyer's right to cancel. 16 C.F.R. § 429.1(f); and requires the seller to honor any valid notice of cancellation by a buyer and, within 10 business days after receipt of such valid notice, to refund to the buyer all payments made under the contract. 16 C.F.R. § 429.1(g).

34.     Pursuant to Section 18 of the FTC Act, 15 U.S.C. § 57a(d)(3), and 16 C.F.R. § 429.1, a violation of the Cooling-Off Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). A violation of the Cooling-Off Rule made with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), is subject to monetary civil penalties of up to $46,517 for each violation after January 10, 2022, including penalties whose associated violation predated January 10, 2022. *See* 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015); *see also* 16 C.F.R. § 1.98(d).

## WISCONSIN DIRECT MARKETING RULE AND FRAUDULENT MISREPRESENTATION LAW

35.     Promulgated under the authority of Wis. Stat. § 100.20(2), the Wisconsin Direct Marketing Rule, Wis. Admin. Code § ATCP ch. 127, requires "sellers" of consumer goods and services to make certain disclosures in mail solicitations and during face-to-face solicitations that occur away from the seller's regular place of business.

36.     The Wisconsin Direct Marketing Rule defines "seller" as "a person . . . . who is engaged in the business of selling, offering to sell, or promoting the sale of consumer goods or services to consumers" and includes: any "person who accepts payment for a purported sale of consumer goods or services," any "employee or agent of a seller," and any "person who makes

solicitations under arrangement with a seller." Wis. Admin. Code § ATCP 127.01(21). "Person" includes both individuals and corporate entities. Wis. Admin. Code § ATCP 127.01(15).

37.     The Wisconsin Direct Marketing Rule also forbids misrepresentations, both in mail solicitations and during face-to-face solicitations or at any point during the subsequent transaction between seller and consumer. Wis. Admin. Code §§ ATCP 127.30, 127.44, 127.60, 127.72.

38.     The Wisconsin Direct Marketing Rule also requires sellers to comply with certain provisions of the Wisconsin Consumer Act, Wis. Stat. chs. 421 – 427, when engaged in direct marketing. For instance, the Wisconsin Direct Marketing Rule provides that any failure to comply with the Wisconsin Consumer Act's three-day right to cancel in a direct marketing transaction also violates the Wisconsin Direct Marketing Rule itself. Wis. Admin. Code §§ ATCP 127.46(3), 127.74(4).

39.     Wisconsin law also forbids misrepresentations in commerce more generally. Wisconsin Stat. § 100.18(1) provides, in relevant part, that "no person, with intent to sell, distribute, increase the consumption of . . . anything . . . shall make, publish, disseminate, circulate, or place before the public . . . an advertisement, announcement, statement or representation of any kind . . . which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

40.     The Wisconsin Attorney General and Wisconsin Department of Justice are authorized to bring civil actions in the name of the State of Wisconsin to enforce and enjoin violations of the foregoing laws and to seek temporary and permanent injunctive relief, civil forfeitures, restitution for consumer pecuniary losses, and other relief, such as recovery of the State of Wisconsin's costs. Wis. Stat. §§ 100.18(11)(d), 100.20(6), 100.26, 100.263.

41.     When the Wisconsin Direct Marketing Rule, Wis. Admin. Code § ATCP chapter 127 ("Wisconsin Direct Marketing Rule"), and the Wisconsin Fraudulent Misrepresentation Law, Wis. Stat. § 100.18, are violated, the State of Wisconsin may obtain temporary and permanent injunctive relief, civil forfeitures, restitution for consumer pecuniary losses, and other relief, such as recovery of the State of Wisconsin's costs.

## DEFENDANTS' BUSINESS ACTIVITIES

42.     Since at least late 2018, Defendants have engaged in a scheme to sell bogus timeshare exit services through direct mail campaigns and in-person sales presentations to consumers throughout the United States.

### *Defendants' Deceptive Direct Mail Campaign*

43.     Defendants initially contact consumers who own timeshares through a direct mailing campaign. Defendants send consumers glossy flyers such as the one in Figure 1 promising that consumers can "[l]earn how to recover 100% of [thei]r timeshare's full purchase price" by attending one of Defendants' in-person "information sessions" at a local hotel or restaurant. Defendants have mailed these flyers to consumers in Wisconsin and other states across the United States.



**Figure 1**

44.     Defendants' fliers make misleading and false representations. For example, Defendants suggest that they are accredited by a "Consumer Rights Council," which they represent to be an independent advocacy organization when in fact it is a sham nonprofit corporation that Defendants formed to create the appearance of legitimacy, but which has no accreditation authority and accredits no one except for Defendants.

45.     Defendants' flyers encourage consumers to call them and reserve a spot at one of Defendants' presentations, typically a local hotel or restaurant, sometimes offering consumers a $250 Shopping Card for attending.

46.      Most of the people who attend Defendants' presentations are seniors. Defendants have conducted these presentations in Wisconsin, Missouri, and other states across the U.S.

### *Defendants' Sales Presentations*

47.     Consumers who attend Defendants' presentations are subjected to hours-long sessions during which Defendants strongly imply that it is in their and their families' best interest to pay thousands of dollars to help them get out of their timeshares. Defendants' sales pitch often will continue for hours until consumers agree to purchase Defendants' timeshare exit services.

48.     Defendants' presentations start with a group presentation of approximately 40 minutes, followed by individual meetings with Defendants' sales personnel. During the group presentation, Defendants make misleading and false representations that suggest theirs are legitimate companies. For example, they display the logos of established entities such as RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau, and represent, falsely, that Defendants are "Proud Partners" of these organizations or are accredited by them. Defendants also continue to tout their "accreditation" by the Consumer Rights Council they created to give them an air of legitimacy.

49.     Defendants also stoke consumers' fears by telling them that the timeshare industry has been working against them to pass legislation that will limit their ability to exit their timeshares and will cause annual maintenance fees to increase exponentially. Defendants represent that if consumers do not sign up for Defendants' services that day, this one-time opportunity will be lost, and their children and grandchildren will be stuck paying the ever-increasing annual maintenance fees in perpetuity.

50.     Defendants further claim, falsely, that consumers cannot exit their timeshare contracts on their own and that paying for Defendants' services is the only way consumers will be able to exit their timeshares. In fact, consumers have other avenues by which to exit their

timeshares, such as by working directly through their timeshare developer's own exit programs or selling their timeshare on the open market.

51.     Defendants also represent that they will secure consumers' exit from their timeshare within a specific time or consumers will receive a full refund.

52.     By the end of the group presentation, consumers are desperate to hear how they can get out of their timeshares to prevent saddling their heirs with the growing maintenance fees. On cue, Defendants then indicate that they can get consumers out of their timeshares within a specified time, generally between one and two years. Defendants further represent that if they fail to secure the exit within the specified time, consumers will receive a full refund of Defendants' fee. In truth, Defendants are rarely able to secure consumers' exits from their timeshares at all, let alone within the time specified. Despite that, Defendants have refused to provide the promised full refunds to consumers who seek them.

53.     After the group sales presentation, Defendants' salespeople meet with individual consumers to press them to purchase Defendants' exit services. In these individual meetings, the salespeople reinforce the misrepresentations made in the group presentation and show them additional misleading information to scare them. For example, Defendants present consumers with a chart that purports to show how much their annual maintenance fees will increase over a thirty-year period. Defendants presented one consumer with a chart showing that her $1,821 per year maintenance fee would balloon to $13,309 per year in 30 years and that she or her children and grandchildren would end up paying a total of $175,110 in maintenance fees over those 30 years.

54.     After intimidating consumers with the foregoing information, Defendants' salespeople typically offer consumers three options: (1) do nothing and be stuck paying those

fees in perpetuity; (2) convert their current timeshare into a new timeshare; or (3) purchase Defendants' timeshare exit services so they can get rid of the timeshare once and for all. Although Defendants provide no explanation as to how they calculate the costs of the three options, they always portray the last option—exit—as the least expensive. As a result, that is the option many consumers choose.

55.     Not until this point do Defendants disclose the large upfront fee for their services. Defendants' fee ranges from approximately $5,000 to over $80,000 depending on the number of timeshares consumers are seeking to exit and Defendants' "valuation" of each timeshare.

56.     To allay consumers' fears about the cost of Defendants' services, Defendants promise that if they do not exit consumers from their timeshares within the specified time Defendants will fully refund their fee.

57.     If consumers hesitate or indicate they are not interested in Defendants' services, Defendants ratchet up the pressure. In some instances, for example, they tell consumers that if they walk out the door, their opportunity to exit their timeshare will be lost forever. In other instances, they try to make consumers feel guilty by accusing them of wasting Defendants' time and just coming for the free meal. One consumer reported that Defendants' salesperson would not even allow her and her husband to excuse themselves to use the restroom at the same time because the salesperson did not want to give them the opportunity to leave.

### *Defendants' Contract and Cancellation*

58.     Consumers who are deceived into purchasing Defendants' services are then presented with a contract that reinforces Defendants' promise to secure consumers' exits from their timeshares, and to fully refund the upfront fee if Defendants fail to do so. Defendants' contract states unequivocally in bold font:

**MONEY BACK GUARANTEE ("GUARANTEE")**
**Consumer Law guarantees our Service--we will get You out of Your timeshare or**
**we will give You a complete and full refund.**

59.     Defendants' contract affirmatively indicates that "[t]his is a legally binding

contract and does NOT have a cancellation period. By initialing here and signing below client

acknowledges understanding of this statement."

60.     Defendants' contract does not notify consumers of their right under the Cooling-

Off Rule or its state law equivalents to cancel the contract within three business days or some

other time period specified by state law, nor do Defendants provide any type of alternative notice

of a cancellation right. For example, Defendants do not provide consumers with any type of

receipt informing them of their right to cancel within three business days.

61.     Defendants do not give consumers a "Notice of Right to Cancel" or "Notice of

Cancellation" form that consumers can use to cancel their contract with Defendants.

62.     Nor do Defendants orally tell consumers that they have the right to cancel their

contract within three business days of signing.

63.     Defendants require consumers to immediately sign the contract and to pay

Defendants' fee before leaving the presentation. Defendants do not allow them to take the

contract home to review it or to consult an attorney or anyone else before signing.

### *Defendants Fail to Fulfill Their Promises, Attempt to Conceal*
### *the Scheme, and Refuse to Refund Consumers' Money*

64.     In numerous instances, Defendants do not get consumers out of their timeshare

contracts despite having promised to do so and taken consumers' money.

65.     When consumers complain about Defendants' failure to get them out of their

timeshare contracts, Defendants take steps to conceal the fact that they have not been working on

getting consumers out of their timeshare contracts to keep consumers from asking for refunds or

filing complaints with the FTC or state law enforcement authorities.

66.     Further, on those rare instances when Defendants do, in fact, file lawsuits on consumers' behalf, those lawsuits typically seek relief other than getting consumers out of their timeshare contracts. For example, Defendants filed two mass actions on behalf of consumers, but the relief sought was for an accounting, not for release of the consumers from their timeshare contracts. These were merely nuisance suits to serve as cover so that Defendants can represent to consumers that they are taking "legal action" on consumers' behalf.

67.     When consumers attempt to cancel Defendants' services and obtain the refund that was promised at the time of purchase, Defendants have refused to refund consumers who attempt to cancel, citing the contract's no cancellation clause. Consumers who attempt to exercise their right to cancel the contract within three business days of enrolling are told that they have no right to cancel. Defendants also refuse to refund consumers' payment within ten days of the receipt of such a valid cancellation notice.

68.     Only in very rare cases will Defendants issue a refund – typically only if consumers sue them or enlist the help of state law enforcers in getting a refund.

69.     The Individual Defendants benefited financially from the scheme.

70.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

### COUNT I
**Misrepresentations About Defendants' Timeshare Exit Services in Violation of Section 5 of the FTC Act**
**(By Plaintiff United States)**

71.     Paragraphs 1 through 70 are incorporated as if set forth herein.

72.     In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of timeshare exit services, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.   Defendants will get consumers out of their timeshare contracts within a specified time;

    b.   Consumers will recover 100% of their timeshare's purchase price;

    c.   Defendants will refund their fee if they fail to get consumers out of their timeshare contracts within the specified time;

    d.   That Defendants are representatives of, affiliated with, or accredited by legitimate entities such as RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau, and

    e.   That consumers' children, grandchildren, and/or other heirs will be responsible for the payment of consumers' timeshare maintenance fees in perpetuity.

73.    Defendants' representations are false or misleading, or were not substantiated at the time the representations were made, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT II
**Unfair Pattern of Business Practices**
**in Violation of Sections 5(a) and (n) of the FTC Act**
**(By Plaintiff United States)**

74.    Paragraphs 1 through 73 are incorporated as if set forth herein.

75.    In numerous instances, Defendants have induced consumers into signing contracts for timeshare exit services containing non-negotiable and unenforceable terms and then prevented consumers from legally cancelling those contracts and obtaining refunds by, *e.g.,*

using high pressure tactics and deceptive sales practices to require consumers to sign contracts with non-negotiable terms, such as a term that contradicts federal law, failing to notify consumers of their right to cancel the contracts under federal and state law, promising illusory money-back guarantees and full refunds, and frustrating the efforts of consumers who try to cancel their contracts or obtain the promised refunds.

76.     Defendants' actions cause or are likely to cause substantial injury to consumers that they cannot reasonably avoid themselves and are not outweighed by countervailing benefits to consumers or competition.

77.     Defendants' practices constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

<u>COUNT III</u>
**Violation of the Rule Concerning Cooling-Off Period for Sales Made at Home or at Certain Other Locations**
**(By Plaintiff United States)**

78.     Paragraphs 1 through 77 are incorporated as if set forth herein.

79.     Defendants are "sellers" as that term is defined in Section 429.0(c) of the Cooling-Off Rule and have been engaged in "door-to-door sales" of "consumer goods or services," as those terms are defined in Section 429.0(a) and (b) of the Cooling-Off Rule.

80.     In numerous instances in connection with the door-to-door sales of their timeshare exit services, Defendants have:

  a.   Failed to furnish buyers with a receipt or contract informing them of their right to cancel the transaction within three business days, 16 C.F.R. § 429.1(a);

b.   Failed to furnish buyers with a "NOTICE OF CANCELLATION" or "NOTICE OF RIGHT TO CANCEL" in duplicate, that buyers can use to cancel the transaction, 16 C.F.R. § 429.1(b) and (c);

c.   Included in buyers' contracts a waiver of the rights they are entitled to under the Cooling-Off Rule, 16 C.F.R. § 429.1(d);

d.   Failed to orally inform buyers of their right to cancel the transaction, 16 C.F.R. § 429.1(e);

e.   Misrepresented to buyers their right to cancel, 16 C.F.R. § 429.1(f); and

f.   Failed to honor valid notices of cancellation and within 10 business days after the receipt of such notice by refunding to buyers all payments made under the contract, 16 C.F.R. § 429.1(g).

81.   Defendants have knowledge or knowledge fairly implied regarding the Cooling-Off Rule and similar laws.

82.   Defendants' practices violate the Cooling-Off Rule, 16 C.F.R. § 429.1, and therefore are unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

**COUNT IV**
**Misrepresentations in Violation of Wis. Admin. Code § ATCP ch. 127**
**(By Plaintiff State of Wisconsin)**

83.   Paragraphs 1 through 82 are incorporated as if set forth herein.

84.   Defendants are "sellers" within the scope of Wis. Admin. Code § ATCP 127.01(15).

85.   Defendants have violated Wis. Admin. Code §§ ATCP 127.44(15) and 127.72(15) by making false, deceptive and/or misleading representations to Wisconsin consumers in mail

transactions and face-to-face transactions, including but not necessarily limited to misrepresenting that:

    a.  Consumers' children, grandchildren, and/or other heirs will be responsible for the payment of consumers' timeshare maintenance fees in perpetuity;

    b.  Defendants will get consumers out of their timeshare contracts, typically within a specified time;

    c.  Consumers will recover 100% of their timeshare's purchase price;

    d.  Defendants will refund their fee if they fail to get consumers out of their timeshare contracts within the specified time;

    e.  Defendants are representatives of, otherwise affiliated with, or accredited by RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau, and

    f.  Consumer Rights Council is an independent advocacy organization that has accredited Defendants.

86.    Alternatively, the Defendants have violated Wis. Admin. Code §§ ATCP 127.50 and 127.78 by providing knowing assistance to the other Defendants' violations of Wis. Admin. Code § ATCP 127.44(15) and 127.72(15).

### <u>COUNT V</u>
**Failure to Comply with Three-Day Right to Cancel Law in Connection with Direct Marketing Transactions in Violation of Wis. Admin. Code § ATCP ch. 127**
**(By Plaintiff State of Wisconsin)**

87.    Paragraphs 1 through 86 are incorporated as if set forth herein.

88.    Defendants are "sellers" within the scope of Wis. Admin. Code § ATCP 127.01(15).

89.     Defendants have violated Wis. Admin. Code §§ ATCP 127.46(3) and 127.74(4) by failing to provide a notice under Wis. Stat. § 423.203 of the consumer's right to cancel and/or by failing to honor consumers' rights to cancel under Wis. Stat. § 423.202 in mail transactions and/or face-to-face transactions, as described in paragraphs 50-63 herein.

90.     Alternatively, the Defendants have violated Wis. Admin. Code §§ ATCP 127.50 and 127.78 by providing knowing assistance to the other Defendants' violations of Wis. Admin. Code §§ ATCP 127.44(15) and 127.72(15).

**COUNT VI**
**Failure to Make Opening Disclosures in Mail Solicitations**
**in Violation of Wis. Admin. Code § ATCP ch. 127**
**(By Plaintiff State of Wisconsin)**

91.     Paragraphs 1 through 90 are incorporated as if set forth herein.

92.     Defendants are "sellers" within the scope of Wis. Admin. Code § ATCP 127.01(15).

93.     Defendants violated Wis. Admin. Code § ATCP 127.32 by failing to disclose in mail solicitations to Wisconsin consumers the true nature of the sales presentations to which consumers were being invited.

94.     Defendants' mail solicitations described in paragraphs 43-45 failed to disclose that the events consumers were being invited to attend were, in fact, sales presentations during which Defendants would attempt to sell their purported timeshare exit services.

95.     Alternatively, the Defendants have violated Wis. Admin. Code §§ ATCP 127.50 and 127.78 by providing knowing assistance to the other Defendants' violations of Wis. Admin. Code § ATCP 127.32.

## COUNT VII
### Fraudulent Misrepresentation in Violation of Wis. Stat. § 100.18(1).
### (By Plaintiff State of Wisconsin)

96.     Paragraphs 1 through 95 are incorporated as if set forth here.

97.     Defendants violated Wis. Stat. § 100.18(1) by making untrue, deceptive and/or misleading representations to Wisconsin consumers, including but not necessarily limited to misrepresenting that:

    a.   Consumers' children, grandchildren, and/or other heirs will be responsible for the payment of consumers' timeshare maintenance fees in perpetuity;

    b.   Defendants will get consumers out of their timeshare contracts, typically within a specified time;

    c.   Consumers will recover 100% of their timeshare's purchase price;

    d.   Defendants will refund their fee if they fail to get consumers out of their timeshare contracts within the specified time;

    e.   Defendants are representatives of, otherwise affiliated with, or accredited by RCI, LLC, Interval International, Wyndham Destinations, Bluegreen Vacations Unlimited, Inc., the American Resort Development Association, and the Better Business Bureau, and

    f.   Consumer Rights Council is an independent advocacy organization that has accredited Defendants.

### CONSUMER INJURY

Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Cooling-Off Rule, the Wisconsin Direct Marketing Rule, and the Wisconsin Fraudulent Misrepresentation Law. Absent injunctive relief

by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, the Cooling-Off Rule, the Wisconsin Direct Marketing Rule, and the Wisconsin Fraudulent Misrepresentation Law by Defendants;

B.      Award Plaintiff United States monetary civil penalties from each Defendant for every violation of the Cooling-Off Rule;

C.      Award monetary and other relief within the Court's power to grant, including relief under Section 19 of the FTC Act; restitution of consumers' pecuniary losses pursuant to Wis. Stat. §§ 100.18(11)(d) and 100.20(6), civil forfeitures pursuant to Wis. Stat. §§ 100.26(4) and 100.26(6); supplemental forfeitures pursuant to Wis. Stat. § 100.264 for each violation of Wis. Stat. §§ 100.18(1) and 100.20 that was perpetrated against a person at least 62 years of age; and the expenses incurred by the Wisconsin Department of Agriculture, Trade and Consumer Protection and the Wisconsin Department of Justice in their investigation and prosecution of this matter, including reasonable attorney fees, pursuant to Wis. Stat. §§ 93.20(2), and 100.263; and

D.      Award any additional relief as the Court determines to be just and proper.

Dated: November 21, 2022                    Respectfully submitted,

SAYLER A. FLEMING
United States Attorney
Eastern District of Missouri

s/ Nicholas P. Llewellyn
NICHOLAS P. LLEWELLYN (Bar # 43839)
Assistant United States Attorney
Civil Chief
United States Attorney's Office
Eastern District of Missouri

Thomas F. Eagleton Courthouse
111 South 10th Street, Suite 3.300
St. Louis, MO 63102
Phone: (314) 539-7637
Nicholas.Llewellyn@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Acting Director
Consumer Protection Branch

LISA K. HSIAO
Assistant Director

s/ Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE (Bar # 23133TN)
AMY P. KAPLAN (Bar # 1010279DC)
Trial Attorneys
P.O. Box 386
Washington, DC 20044
Phone: (202) 451-7731
Ellen.Bowden.McIntyre@usdoj.gov
Amy.P.Kaplan@usdoj.gov

Attorneys for Plaintiff
THE UNITED STATES OF AMERICA

JOSHUA L. KAUL
Attorney General, State of Wisconsin

s/ Lewis W. Beilin
Lewis W. Beilin (Bar #1038835WI)
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3076
Email: beilinlw@doj.state.wi.us

Attorney for Plaintiff
STATE OF WISCONSIN

Of Counsel:

SAMANTHA DENNY
WILLIAM J. HODOR
Federal Trade Commission
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
(312) 960-5623 (Denny)
(312) 960-5592 (Hodor)
sdenny@ftc.gov
whodor@ftc.gov